UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LARRY JEROME EASTMAN | Case No. 1:22-cr-22 |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Defendant, Mr. Larry Eastman, through undersigned counsel, hereby submits his Memorandum in Aid of Sentencing in support of his request that, pursuant to the 18 U.S.C. 3553(a) factors, the Court sentence him to a period of 96-120 months incarceration in this case. Despite the government's vitriol against Mr. Eastman, the facts in this case support a below-guidelines sentence and is consistent with the Court's obligation to "impose a sentence sufficient, but not greater than necessary" to meet specified sentencing goals. 18 U.S.C. § 3553(a).

**I. PROCEDURAL AND FACTUAL BACKGROUND**

On January 18, 2022, a three-count indictment was returned against Larry and Justice Eastman charging them with, *inter alia*, conspiracy to distribute fentanyl. Both defendants were arrested on January 26, 2022. At the time of his arrest, Larry Eastman was residing in Maryland with his child's mother. Agents seized three large bags of marijuana along with 80 fake oxycodone pills containing fentanyl and 19 counterfeit Xanax pills.[1] At the time of his arrest, Mr. Eastman's brother, Craig Eastman, was visiting Mr. Eastman. He was not arrested at that time.[2]

---

[1] The marijuana was seized from a bedroom closet, not the kitchen counter as represented by the government. Government's Memorandum in Aid of Sentencing ("Gov's Mem.") at 10.
[2] Mr. Eastman's brother was subsequently arrested on March 22, 2023, and has been indicted for, *inter alia*, distribution of fentanyl. *See* 23cr0073. According to the government, defendants Craig Eastman and Charles Jeffrey Taylor were purchasing fentanyl pills in bulk from a third co-defendant, Hector Valdez. PSR ¶ 34.

1

On February 8, 2023, Mr. Eastman pled guilty to Count One of the Indictment charging him with Conspiracy to Distribute and Possess with Intent to Distribute a Mixture and Substance Containing a Detectable Amount of Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 846. Mr. Eastman's factual proffer acknowledged the sale of fentanyl resulting in overdose in November 2020 (Count II) but specifically disputed that he had caused the death of the decedent in April 2021, language the government agreed to include in the plea agreement and factual proffer.

As discussed more comprehensively below, Mr. Eastman has fully accepted responsibility for the crimes he committed. He asks that the Court consider all of the information contained in the Presentence Investigation Report ("PSR") and this sentencing memorandum to aid in determining a just sentence pursuant to the factors to be considered in 18 U.S.C. § 3553. It is Mr. Eastman's hope that upon consideration of all of the relevant sentencing factors that the Court will agree that a period of incarceration of not more than 10 years is sufficient to meet the sentencing goals specified in 18 U.S.C. § 3553(a).

## II.     MR. EASTMAN'S PERSONAL BACKGROUND

Mr. Eastman is a 23-year old young man who "grew up in poverty with violence around him." (*See* Presentence Investigation Report ("PSR"), ECF No. 49, ¶ 63). His father was "in and out" of his life and he was primarily raised by his mother, who passed away shortly after his arrest in this case. *Id.* ¶¶ 62, 65. His brother was shot and killed by law enforcement officers at the age of 19. *Id.* ¶ 61. This led to Mr. Eastman's mother becoming depressed and turning to alcohol to ease her suffering. *Id.* ¶ 62. Despite the terrible lot in life Mr. Eastman drew, he has no criminal convictions prior to this case.

Mr. Eastman first tried marijuana in the 11th grade and became a frequent user of the substance, smoking twice daily. *Id.* ¶ 81. He began abusing Percocet pills at the age of 19, shortly

after his father's death. *Id.* ¶ 82.[3] Despite this drug use, Mr. Eastman graduated from Ballou High School, where he was ranked 23rd out of 199 students. *Id.* ¶¶89-90. He subsequently attended two years of college at Bowie State University. *Id.* ¶ 90. During that time, he stayed with a relative to be closer to school and focus on his studies. It is clear that Mr. Eastman is an intelligent young man, however, that intelligence has not always been able to overcome the negative influences that have permeated his life.

The government's portrayal of Mr. Eastman, supported by images showing him holding money, is contrary to the person those closest to him know him to be. *See* Ex. A, Letters in Support of Larry Eastman. These letters and Mr. Eastman's lack of a prior criminal history belie the government's attempt to paint Mr. Eastman as someone who sought to intentionally hurt others for money. One friend writes that in knowing Mr. Eastman for 20 years, he "has always carried himself with humility, kindness, respect for all people," despite growing up in a community where the "majority" of their peers were "troublesome, rude and reckless." This person describes Mr. Eastman as someone who "didn't like to hurt people or didn't even like to see people being hurt," and believes "there is not a chance that Larry would do harm to someone for financial gain." *See* Ex. A, Letter from T. Allen. Another friend describes Mr. Eastman as kind, nice and fair, someone who wanted to "get his family out the hood and take care of his siblings…." *See* Ex. A, Letter from J. Hicks.

Not a person to just rely on his words, Mr. Eastman is desperate to show the Court he is willing to change his ways. He applied for and has been accepted as a participant in Young Men

---

[3] Contrary to the government's unfounded assumption, Mr. Eastman never stated that he overdosed on fentanyl. Gov.'s Mem. at 1. Rather, a plain reading of the PSR quotes Mr. Eastman as stating that he "almost" overdosed" but did not state the basis for the overdose, the source of the drugs (although Mr. Eastman admitted to taking Percocets, not fentanyl), and did not indicate he went to a hospital where he was told the nature of the overdose. PSR ¶ 84. Thus, the government's suggestion that the defendant "knew" the pills he assisted in providing to decedent were dangerous as a result of containing fentanyl is unfounded and purely speculative; fentanyl is not the only substance that can cause an overdose.

3

Emerging (YME). *See* Ex. A, Letter from Keith A. Thompson. YME is a housing unit dedicated to young adult offenders (ages 18-25 years old) and offers education, job training, life skills, parenting, college level courses, mentoring, mental health, financial literacy and other programs designed to improve inmates' well-being. *Id.* The goal of the program is to address "the reentry needs of this population pre-release." *Id.* In addition, Mr. Eastman has been participating in meditation classes, where he has sought to contribute to the group and share his knowledge with others. *Id.* (Letter from J. Waterman). In sum, even in the midst of these very adverse circumstances, Mr. Eastman is committed to becoming a better version of himself so that he may become a contributing member of society.

**III.    THE GOVERNMENT'S EVIDENCE FAILS TO ESTABLISH THE DRUGS MR. EASTMAN ASSISTED IN DISTRIBUTING WERE THE CAUSE OF THE DECEDENT'S DEATH.**

The decedent is alleged to have purchased narcotics from Mr. Eastman shortly before an overdose on November 2, 2020, and again on or about April 5, 2021, the night before her death. *See* ECF No. 8 at 2-4; Indictment (Counts Two-Three). While Mr. Eastman has accepted responsibility for the decedent's overdose, he continues to "dispute that there is sufficient evidence to prove that the fentanyl he helped distribute caused the victim's death." Plea Agreement at 2-3; Proffer of Evidence at ¶¶ 7-8. Despite agreeing to the inclusion of this language for purposes of securing the plea agreement, the government now characterizes this denial as "callous," "pure balderdash" and "especially odd." Gov's Memo. at 2, 12 & n.3. The government's purported outrage is misplaced and contradictory.

While the government may now regret permitting Mr. Eastman to include this denial, the language was permitted because there is a factual basis for Mr. Eastman to dispute whether the pills he helped to distribute caused the decedent's overdose. In the discovery provided by the

4

government, CCTV footage shows the decedent, in the hours before her death, meeting a man in the lobby of the decedent's apartment building, who places something into the decedent's hand. The decedent then appears to engage in a transaction on her phone and the man leaves. This person, who was later interviewed by agents, was with the decedent between 10:18 pm – 10:21 pm. The decedent then leaves the apartment building at 11:26 pm and there is no video between approximately 11:35 pm – 12:00 am. This man is subsequently observed by law enforcement officers at the decedent's apartment the morning of April 6, 2021. As it turns out, this male was well-known to the decedent and her family, so it not surprising there were no other messages in the decedent's phone seeking to purchase drugs – the decedent clearly knew to meet this individual in the lobby of her apartment building at a designated time. This transaction – which had not been highlighted by the government in its production as potentially exculpatory- undermines a definitive conclusion that it could only be the drugs the decedent received at Raynolds Place that caused the decedent's overdose.[4]

The government also relies on text messages to establish that Mr. Eastman was the person who sold the decedent the fatal dose of fentanyl, as well as a Cash App transaction made to an account under the name "$princessjaee202" prior to the decedent traveling to the Raynolds Place property on the evening of April 5, 2021. *ECF No. 8 at 3*. However, the government does not dispute that Mr. Eastman did not physically provide the decedent with any narcotics in the hours leading to her death, *nor was he present at the location during the time of alleged sale. Id.* Therefore, Mr. Eastman is *not* the male that was observed by the Uber driver meeting with the decedent on the night preceding her death. He was not even in the District of Columbia at that

---

[4] Notably, the male seen in the decedent's lobby with her on the evening preceding her fatal overdose was interviewed by agents in this case, however, he made no mention of the fact that he had given something to the decedent, nor did the discovery produced by the government indicate that he was asked about the apparent transaction.

time. The person who was at the Raynolds Place address – the defendant's sister and co-defendant Justice Eastman – could perhaps identify who it was who actually provided those pills to the decedent but it was not Mr. Eastman.

Because of these facts, the government agreed, that as part of the plea agreement, Mr. Eastman could include language disputing whether the fentanyl he helped distribute was the cause of the decedent's fatal overdose. The decedent engaged in at least two separate purchases of narcotics on the evening of April 5th. Mr. Eastman was not present at either transaction, and no witnesses have attested to what the decedent received from the man in the lobby versus what she received from an unidentified male at Raynolds Place. If having a finding that Mr. Eastman was responsible for the sale of the fatal overdose was essential to the government, it could have insisted Mr. Eastman agree to accept responsibility for that act or choose to proceed to trial. The government did neither. Thus, while the government characterizes Mr. Eastman's denial as "especially odd," what is especially odd is that the government is asking the Court to make a factual finding that is undermined by its own evidence, evidence they curiously did not even mention in their sentencing memorandum. For these reasons, the Court should decline the government's request to find Mr. Eastman culpable for the decedent's death by a preponderance of the evidence.

**IV.    THE COURT SHOULD REJECT THE SENTENCING ENHANCEMENT FOR MAINTAINING A DRUG PREMISES.**

Nor does the evidence before the Court demonstrate that Mr. Eastman "maintained a premise for the purpose of manufacturing or distributing a controlled substance." USSG §2D1.1(b)(12). The government did not request this specific offense characteristic to be applied; nor is it a part of the parties' plea agreement. For this enhancement to apply, the court should consider whether (1) the defendant held a possessory interest in the premises and (2) the extent to

6

which the defendant controlled access to, or activities at, the premises." USSG §2D1.1(b)(12) (Comment). Manufacturing or distributing a controlled substance "must be one of the primary or principal uses for the premises." *Id.*

Mr. Eastman in no way controlled access to or the activities at the Raynolds Place location. It is worth noting that there were periods of time – such as when he was in college (2018-2019) and prior to his arrest – that he was not even living at the residence. There were at least three other adults living there, including Mr. Eastman's sisters and their minor children. Although Mr. Eastman was listed as a resident on the Raynolds Place apartment lease, notably, as evidenced on the Report of Investigation dated 6/7/21, his mother was identified as the "lessee and head of household." At the time of his arrest, Mr. Eastman had been residing with his girlfriend for at least two months, PSR ¶ 67, and other evidence suggests Mr. Eastman had been regularly staying with his girlfriend prior to that date. Furthermore, there is no direct evidence that the premises was *primarily* used to manufacture or distribute a controlled substance. No signs of drug manufacturing were seen; nor has there been evidence that drug sales occurred inside the home.

In support of the application of the enhancement, the probation officer cites *United States v. Eustice*, 952 F.3d 686 (5th Cir. 2020). *Eustice* is inapposite because it does not even address the critical factor of whether the defendant in fact exercised control of the premises, which is the defendant's argument here. Furthermore, *Eustice* is distinguishable from the present case. In that case, during execution of a search warrant, officers seized "digital scales, meth pipes, an unknown quantity of meth, and 'other drug paraphernalia consistent with drug trafficking." *Id.* at 689-90. Separately, when arresting the defendant, officers observed "a glass meth pipe, digital scales with suspected meth residue and a plastic baggie containing suspected meth near the area where [the defendant] had been sitting." *Id.* at 690. In the present case, there were no signs of drug

7

paraphernalia that indicated that the premises was being used for the purposes of drug trafficking or manufacturing drugs.[5] Rather, the fact that drugs were located in the home, standing alone, does not indicate the premises as a whole was used primarily for drug trafficking. *See, e.g., United States v. Morales*, 879 F. Supp. 2d 608, 610 (E.D. Tex. 2012) (court declined to apply the Section 2D1.1(b)(12) enhancement where although the evidence established possession of the apartment by the defendant, it did not establish "the maintenance of the premises for the purpose of manufacturing or distributing a controlled substance.") (footnote omitted). For these reasons, Mr. Eastman asks that the Court not apply the two-point sentencing enhancement.

## V. THE SENTENCING FACTORS

As the Supreme Court has long recognized, "it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). With the United States Sentencing Guidelines rendered "advisory only," a district court has substantial discretion in fashioning a sentence appropriate to the individual circumstances of the defendant and the unique facts of the offense. *Kimbrough v. United States*, 552 U.S. 85, 90-91 (2007) (agreeing with *United States v. Booker,* 543 U.S. 220, 244 (2005), and stating that "[*Booker*] instructed district courts to read the United States Sentencing Guidelines as 'effectively advisory' . . . ."). While the Court must consider the guideline range in a case, "the Guidelines are not the only consideration, however." *Gail v. United States*, 128 S. Ct. 586, 597 (2007); *see also Kimbrough*, 552 U.S. at 91 ("the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence").

---

[5] According to the government's theory, the drugs were manufactured outside of the District of Columbia. *See* PSR ¶ 34.

In *United States v. Booker*, the United States Supreme Court determined that district courts must consider all of the sentencing factors under 18 U.S.C. § 3553(a) without giving mandatory weight to the sentencing guidelines. *See* 543 U.S. 220 (2005). Indeed as mandated by Congress, the fundamental principle of sentencing is that a court "*shall impose a sentence sufficient, but not greater than necessary*" to meet specified sentencing goals. 18 U.S.C. § 3553(a) (emphasis added). Title 18 U.S.C. § 3553(a)(2) states that the purposes of sentencing are to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, Section 3553(a) specifically directs sentencing courts to consider the following factors:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant as described in § 3553(a)(1);

(2) The need for the sentence imposed as described in § 3553(a)(2);

(3) The kinds of sentences available as described in § 3553(a)(3);

(4) The sentencing guideline range and any pertinent policy statements issued by the Sentencing Commission as described in § 3553(a)(4) and (a)(5);

(5) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct as described in § 3553(a)(6); and

(6) The need to provide restitution to any victim of the offense as described in §3553(a)(7).

18 U.S.C. § 3553(a).

Moreover, the Supreme Court has specifically ruled that, in balancing the Section 3553(a)

factors, a judge may determine that "in the particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing." *Kimbrough*, 552 U.S. at 91; *see also Rita v. United States*, 551 U.S. 338, 381 (2007) (noting that a district court may consider arguments that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or 'that' the case warrants a different sentence regardless[.]"). A district court may now vary from the applicable guideline range "based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101.

### V. THE COURT SHOULD SENTENCE MR. EASTMAN TO A PERIOD OF 96-120 MONTHS INCARCERATION.

Based on a fair consideration of the Section 3553 factors below, the Court should sentence Mr. Eastman to a term of imprisonment of 96-120 months. While this period of confinement is below the Guidelines suggested range of 168-210 months, it is sufficient to serve the mutual purposes of punishment and rehabilitation and is still almost three times the amount of time the government is seeking for Mr. Eastman's co-defendant.

There is no dispute that the nature and circumstances of the offense are tragic. Mr. Eastman does not dispute that he helped, along with others, to sell pills containing fentanyl to the decedent and he deeply regrets the role he played in doing so. He has always maintained that he did not manufacture the pills, but got them from others.[6] Nor did he know the pills had fentanyl.[7] He has used pills in the past, but did not state their source and believed the pills to be Percocets. PSR ¶

---

[6] While the government makes the baseless claim that "defendant could very well be responsible for the injuries and deaths of untold others," Gov. Mem. at 15, this is based on pure conjecture. No such deaths have been identified or indicted in this case. Notably, during the government's investigation in this case, agents attempted several purchases of pills from Mr. Eastman, all of which were unsuccessful.
[7] This fact is supported by the government's witness who asked Mr. Eastman about giving the decedent "fake percs" and he allegedly responded that he "didn't get them all from the same person" so he didn't know what they were." Gov's Mem. at 9.

10

84. He recognizes his role in assisting in the sale and distribution of what is an undoubtedly dangerous substance and he deeply regrets causing the decedent and the decedent's family pain.

      Regarding the history and characteristics of Mr. Eastman, he is a young man with no prior criminal convictions. He has grown up in some of the most dangerous communities in the District of Columbia, and resided in a home where criminal activity was frequently conducted by others, including the father of Justice Eastman's children. Mr. Eastman tried to remove himself from the criminal activity – even residing with his aunt during the time he attended Bowie State University and living with his girlfriend. At the time of his arrest, he had moved in with the mother of his young child. Unfortunately, he was unsuccessful in completely removing himself from the criminal activity that had permeated his neighborhood. But he realizes now that dealing drugs of any kind is wrong and he is anxious to begin a new phase of his life. As the letter from Mr. Thompson acknowledges, at 23, Mr. Eastman has not even reached full maturity. See Ex. A, Letter from K. Thompson. He is a young man capable of growth and who is already dedicated to rehabilitating himself.

      Regarding the need for deterrence, a sentence of 96-120 months is an adequate deterrent for Mr. Eastman, who has never been previously charged with a criminal offense and who has, at the earliest opportunity, accepted responsibility for his actions. Being incarcerated in the D.C. Jail since January 2022, away from his newborn daughter and girlfriend, has had a sobering effect on Mr. Eastman. He, along with other prisoners, have been subject to intermittent quarantines as a way to limit transmission of COVID-19, during which not even his attorney was permitted to visit the jail. At only 23 years old, a below-guideline sentence will provide Mr. Eastman with a meaningful opportunity to change the direction of his life.  Furthermore, such a sentence will adequately protect the community against any future criminal activity; as someone who has not

11

been previously incarcerated, a sentence of 96-120 months is a substantial amount of time to be removed from society. In addition, Mr. Eastman should be afforded with the opportunity to receive drug/alcohol treatment, mental health counseling and treatment, and any vocational training that is available to him, which he agrees he desperately needs. While he is not currently in a position to pay a fine or restitution, he is committed to paying restitution upon his release once he has obtained meaningful employment.

Mr. Eastman's request for a sentence of 96-120 months in this case is bolstered by the need to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In this case, the government has blatantly flouted this provision by seeking a sentence of 37 months for his co-defendant, Justice Eastman, a convicted felon who is still under court supervision in Maryland. There is no dispute that Justice Eastman was consistently living at the Raynolds Place address, unlike Mr. Eastman. On the night the decedent purchased the pills that allegedly led to her fatal overdose, there is no dispute Mr. Eastman was not at the Raynolds Place address, but Justice Eastman was. *See* ECF #8, at 10 (Government's Detention Memorandum) (government notes that cell-site data shows Justice Eastman was at the Raynolds Place address when the victim came to pick up the narcotics). Perhaps if Justice Eastman identified the male who left the residence to put the pills in the decedent's hand, the decedent's family could get the "closure" the government seeks. While the government seeks to downplay Justice Eastman's role as being limited to "accept[ing] and mov[ing] the payments … received from their fentanyl sales," Justice Eastman's own social media posts show that she was fully aware of the nature of the sales she was helping to facilitate, which the government argued in its detention memorandum. ECF #8.

While Mr. Eastman recognizes the severity of his offense, his request for a sentence of 96-120 months is still higher than courts in other jurisdictions have sentenced defendants in similar circumstances. *See, e.g., United States v. Ihediwa,* 66 F.4th 1079, 1080 (7th Cir. 2023) (affirming district court's sentence of 40 months' imprisonment where the defendant's sale of fentanyl resulted in the death of a high school student and defendant disputed that he had knowledge of drugs containing fentanyl).

## VI.    CONCLUSION

Mr. Eastman is a young man deserving of a second-chance. Despite being part of a "conspiracy" he is the only one before the Court taking full responsibility for facilitating the sale of fentanyl to the decedent. He asks that the Court sentence him to a period of not more than 120 months incarceration, which is sufficient to acknowledge the weight of the offense he participated in, but also gives him a meaningful chance for rehabilitation and becoming a productive member of society.

Dated:  June 2, 2023

Respectfully submitted,

By: */s/ Michelle N. Bradford*
Michelle N. Bradford, DC Bar #491910
Barnes & Thornburg, LLP
555 12th Street, NW
Washington, DC 20004
Telephone: (202) 408-6922
mbradford@btlaw.com
*Counsel for Defendant Larry Eastman*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of June, 2023, a copy of the foregoing Memorandum in Aid of Sentencing was served on all parties of record via the Court's ECF filing system.

*/s/ Michelle Bradford*
Michelle Bradford