## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**LARRY JEROME EASTMAN,**<br><br>**Defendant.** | **Case No. 22-cr-22-1 (CKK/GMH)** |

### MAGISTRATE JUDGE'S
### <u>REPORT AND RECOMMENDATION</u>

On June 25, 2023, Defendant Larry Jerome Eastman was sentenced to 140 months of imprisonment and three years of supervised release after pleading guilty to one count of conspiracy to distribute and possess with intent to distribute a mixture and substance containing a detectable amount of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(c), and 846. About two months later, the government filed a motion for an order of restitution under the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A, which two weeks later was referred to the undersigned for a Report and Recommendation pursuant to 18 U.S.C. § 3664(d)(6). The undersigned held an evidentiary hearing on the motion on September 5, 2023, and now recommends granting the motion and issuing an order of restitution in the amount of $20,652.25.[1]

### I.    BACKGROUND

As noted, this case has been referred to the undersigned pursuant to 18 U.S.C. § 3664(d)(6). That provision authorizes a court to "refer any issue arising in connection with a proposed order of

---

[1] The docket entries most relevant to this Report and Recommendation are: (1) Defendant's statement of offense, ECF No. 38; (2) Defendant's plea agreement, ECF No. 39; (3) the transcript of Defendant's plea hearing, ECF No. 41; (4) the transcript of Defendant's sentencing, ECF No. 66; (5) the government's motion for an order of restitution, ECF No. 64; (6) Defendant's opposition to that motion, ECF No. 69; (7) the government's reply, ECF No. 70; and (8) the parties' joint pre-hearing statement and its attachments, ECF No. 76. Citations of documents that have been filed on the docket are identified by the document number and page number assigned by the Court's CM/ECF system. Certain exhibits to the parties' joint pre-hearing statement and admitted at the hearing—specifically, three exhibits consisting of CCTV footage (two offered by the government (the government's Exhibits 8 and 9) and one by Defendant (Defendant's Exhibit 10)), all of which have been lodged with the chambers of the undersigned—are identified by party and exhibit number.

restitution to a magistrate judge . . . for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." 18 U.S.C. § 3664(d)(6). To accomplish that, this section—Section I—first outlines the legal requirements and procedural mechanics that govern orders of restitution in criminal cases. Second, it addresses the procedural and factual background of this case and, third, it outlines the undisputed facts and the parties' arguments. Section II evaluates the evidence presented and provides a recommendation as to the resolution of the government's motion for an order of restitution.[2]

### A.    The MVRA and Procedures Governing Orders of Restitution

The MVRA applies "in all sentencing proceedings for convictions of, or plea agreements relating to charges for, any offense . . . in which an identifiable victim or victims ha[ve] suffered a physical injury[.]" 18 U.S.C. § 3663A(c)(1). The statute defines a "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." *Id.* § 3663A(a)(2). If a victim is deceased, a "representative of the victim's estate [or] another family member . . . may assume the victim's rights." *Id.* Where an offense "result[s] in bodily injury to a victim," an "order of restitution shall require [the] defendant" to "pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment," among other things; where the offense results in a victim's death, the defendant must be ordered to "pay an amount

---

[2] Proposed findings of fact and recommendations may be incorporated into an opinion in narrative form. *See, e.g.*, *United States v. Musgrave*, No. 11-cr-183, 2018 WL 328961, at *1 (S.D. Ohio Jan. 9, 2018), *report and recommendation adopted*, 2018 WL 1966232 (S.D. Ohio Apr. 26, 2018); *cf. 3E Mobile, LLC v. Global Cellular, Inc.*, No. 14-cv-1975, 2019 WL 1253455, at *2 (D.D.C. Mar. 19, 2019) (noting that, under Rule 52 if the Federal Rules of Civil Procedure, findings of fact and conclusions of law "may be incorporated in any opinion or memorandum of decision the court may file" (quoting *Paleteria La Michoacana, Inc. v. Productis Lacteos Tocumbo S.A. de C.V.*, 188 F. Supp. 3d 22, 34 (D.D.C. 2016)), *aff'd*, 798 F. App'x 651 (D.C. Cir. 2020).

equal to the cost of necessary funeral and related services." *Id.* § 3663A(b)(2), (3).  In fixing the amount of a restitution award, a court is prohibited from considering "the economic circumstances of the defendant" or whether "a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source." *Id.* 3664(f)(1)(A), (B).

Because the purpose of restitution under the MVRA is "'essentially compensatory: to restore a victim, to the extent money can do so, to the position [the victim or decedent] occupied before sustaining injury[,]' [i]ts authorization is accordingly limited to the actual, provable loss suffered by the decedent and caused by the offense conduct." *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012) (first alteration in original) (internal citation omitted) (quoting *United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006)).  "The government bears the burden of proving by a preponderance of the evidence that restitution is appropriate and the amount of loss sustained by a victim."  *United States v. Emor*, 850 F. Supp. 2d 176, 201 (D.D.C. 2012); *see also* 18 U.S.C. § 3664(e).  The Federal Rules of Evidence do not apply at sentencing proceedings, *see* Fed. R. Evid. 1101(d) ("These rules— except for those on privilege—do not apply to . . . sentencing].]"), so, in making the restitution determination, "a sentencing court may consider hearsay and other out-of-court information to 'guide [its] judgment toward a more enlightened and just sentence.'"  *United States v. Emor*, No. 10-cr-298, 2012 WL 458610, at *2 (D.D.C. Feb. 13, 2012) (alteration in original) (quoting *United States v. Bras,* 483 F.3d 103, 108 (D.C. Cir. 2007)); *see also* ECF No. 76 at 4 (stipulating that "[h]earsay is permitted and the rules of evidence do not apply" to the Court's determination of restitution).

If a court finds that more than one defendant "has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants."  18 U.S.C. § 3664(h).  In deciding whether to apportion the amount of restitution each defendant is responsible for, the court should consider each defendant's "level of

contribution to the victim's loss" and, in contrast to the rule applicable to calculation of the total measure of restitution, "the economic circumstances of each defendant." *Id.* Similarly, the court must consider the defendant's economic circumstances when specifying "the manner in which, and the schedule according to which, the restitution is to be paid." *Id.* § 3664(f)(2). Additionally (again in contrast to the rule applicable to fixing the total amount of restitution), "[i]f a victim has received compensation from insurance or any other source with respect to a loss," the restitution order must require payment to that source but only after the decedents have received their full restitution." *Id.* § 3664(j)(1). Restitution amounts owed to a victim "shall be reduced by any amount later recovered as compensatory damages for the same loss by the decedent" in a civil proceeding. *Id.* § 3664(j)(2).

### B. Factual and Procedural Background

Defendant and his sister Justice Michelle Eastman were indicted in January 2022 for conspiracy to distribute and possess with intent to distribute fentanyl, in violation of 21 U.S.C. § 846; unlawful distribution of fentanyl resulting in serious bodily injury and aiding and abetting, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2; and unlawful distribution of fentanyl resulting in death and aiding and abetting, also in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2. ECF No. 1. The latter two counts were based on allegations that Defendant and his sister made separate sales of fentanyl to a single individual—the decedent—one in early November 2020, that resulted in the decedent's hospitalization on November 3, 2020, from an overdose of fentanyl and one on April 5, 2021, after which the decedent was found dead on April 6, 2021. *See* ECF No. 8 at 2–4.

In January 2023, Defendant and his sister signed separate agreements to plead guilty to the first count in the indictment—conspiracy to distribute and possess with intent to distribute fentanyl. *See* ECF Nos. 36 (Justice Eastman's plea agreement), 39 (Defendant's plea agreement). In her plea

agreement, Justice Eastman admitted to conspiring to distribute fentanyl to individuals in Washington, D.C., from September 2020 to April 5, 2021.  ECF No. 35 at 3 (Justice Eastman's statement of offense).  Her role in the conspiracy, according to her statement of offense, consisted of controlling two Cash App accounts that "received and moved payments from customers purchasing pills containing fentanyl" from her residence; the total amount of fentanyl she conspired to distribute was 36.273 grams.  *Id.*  In connection with his plea, Defendant admitted, as relevant here, to the following facts: (1) "on November 1, 2020, he distributed a mixture of substance containing a detectable amount of fentanyl to [the decedent], and that on November 2, 2020, [she] consumed the fentanyl, resulting in significant bodily injury" and (2) "on April 5, 2021, he conspired and coordinated the distribution of a mixture or substance containing a detectable amount of fentanyl to [the decedent] and that she was found deceased the next morning, April 6, 2021, with the cause of death being acute fentanyl intoxication."  ECF No. 38 at 4 (Defendant's statement of offense); *see also* ECF No. 39 at 2–3.  In connection with the April 2021 distribution, Defendant also admitted that text messages on April 5, 2021, showed the decedent asked Defendant for "jammers" (also known as "percs"), which refer to "blue pills, often counterfeit for Oxycontin, that contain fentanyl"; Defendant instructed her to make payment to a Cash App account,[3] to which the decedent sent $30.00; Defendant directed her to his "man" at 2324 Raynolds Place, SE, Washington, D.C., to retrieve the drugs around 11:00 p.m. on April 5, 2021; and a Lyft receipt shows that the decedent thereafter traveled to that address just after 11:00 p.m. on that date.  ECF No. 38 at 3 & n.1; *see also* ECF No. 76-1 at 89.  However, although Defendant admitted those logistical details concern the sale of fentanyl to the decedent on the evening of April 5, 2021, as well as that the decedent was found dead the next morning on April 6, 2021, of fentanyl poisoning, Defendant did not admit in pleading

---

[3] Justice Eastman's plea agreement admits that she controlled the Cash App account referred to.  *See* ECF No. 35 at 3.

guilty that the fentanyl that he conspired to provide decedent the night before caused her death, asserting that "there is insufficient evidence to establish" such causation.  ECF No. 39 at 3 & n.1; *see also* ECF No. 41 at 24.  As to restitution, Defendant's plea agreement acknowledged that he "understands that the Court has an obligation to determine whether, and in what amount, mandatory restitution applies in this case under 18 U.S.C. § 3663A at the time of sentencing."  ECF No. 39 at 8. Justice Eastman's plea agreement makes no mention of restitution.  *See* ECF No. 36.

On February 8, 2023, Defendant pleaded guilty to the conspiracy count; his sister had pleaded guilty to the same count on January 30, 2023.  *See* Minute Entry (Jan. 30, 2023) (Justice Eastman's plea hearing); Minute Entry (Feb. 8, 2023) (Defendant's plea hearing).  In connection with his plea, Defendant admitted to the facts stated above—that is, that the fentanyl he distributed to the decedent on November 1, 2020, caused her significant bodily injury and that he helped distribute fentanyl to her on the evening of April 5, 2021, after which she was found dead the morning of April 6, 2021, from fentanyl poisoning—and continued to deny that the government had sufficient evidence to prove that the fentanyl from April 5, 2021, caused the decedent's death.  *See* ECF No. 38 at 4; ECF No. 39 at 2–3; ECF No. 41 at 29–30, 39 (plea hearing transcript).

Justice Eastman was sentenced on June 15, 2023.  *See* ECF No. 65 (Justice Eastman's sentencing hearing transcript).  At her sentencing hearing, the government represented she played a "relatively minor" part in the conspiracy.  *See id.* at 12.  There was no evidence that "she physically distributed any of the[] narcotics" involved; rather, her role was "limited to the financial aspect of the transactions."  *Id.*  Her counsel stated that she had no high school diploma, no marketable skills, very little employment history, and three young children.  *Id.* at 22.  Judge Kollar-Kotelly sentenced Justice Eastman to 37 months in prison to be followed by three years of supervised release, noted the government had not requested that she pay restitution, and waived the imposition of a fine because

of an inability to pay. *Id.* at 29–31. Later that same day, at Defendant's sentencing, his counsel argued that the Court should afford him a downward variance from his 168- to 210-month sentencing range under the United States Sentencing Commission Guidelines in part because of the "mercy" shown to his sister. ECF No. 66 at 28; *see also* ECF No. 59 at 17. Judge Kollar-Kotelly sentenced Defendant to 140 months' incarceration (which she found to be the "median" sentence she imposed "in these kinds of cases") and three years of supervised release. ECF No. 66 at 51–54. She also noted that the case was one requiring "mandatory restitution," which the government would be seeking, and suggested that Defendant participate in the Bureau of Prison's program that "allows [an inmate] some income which goes toward paying restitution and some income that . . . [the inmate] can keep." *Id.* at 54–55. As she did with his sister, Judge Kollar-Kotelly waived imposition of a fine, finding that Defendant did not have the ability to pay. *Id.* at 56.

Defendant's admissions establish that he caused the decedent's injuries when she first overdosed on November 3, 2020; however, the government does not seek restitution for medical and related expenses in connection with that overdose. *See* ECF No. 76 at 4. It does seek $20,652.25 in restitution for the costs of the decedent's "funeral, burial, and transportation . . . from the funeral to the burial plot," after she overdosed again on April 5 or 6, 2021, resulting in her death. ECF No. 76-2 at 3–4; *see also* ECF No. 64-1 (receipts for funeral and related expenses in the amount of $20,652.25). Defendant does not quibble with the amount of restitution the government is seeking on the decedent's behalf, *see* ECF No. 76 at 4; *see also* ECF No. 76-4 at 9, but maintains—correctly— that Defendant's admissions do not establish that the drugs he helped provide her on April 5, 2021, caused her death; indeed, Defendant argues, among other things, that there is evidence the decedent purchased drugs from an individual unrelated to this case earlier that evening. *See* ECF No. 66 at 5–6; *see also* ECF No. 76-4 at 2, 7. To determine that factual question—whether a preponderance of

the evidence shows that the fentanyl Defendant helped distribute to the decedent on April 5, 2021, killed her—the undersigned ordered the parties to provide additional evidence supporting their positions, as well as proposed findings of fact and conclusions of law.[4]  *See* ECF No. 72; *see also*

---

[4] It is possible to read some of Judge Kollar-Kotelly's statements at Defendant's sentencing hearing to indicate that she has already made a factual finding about the cause of the decedent's death with relation to restitution—specifically, either that the government (1) has not and cannot show by a preponderance of the evidence that Defendant's fentanyl caused the decedent's death or (2) has already shown by a preponderance of the evidence that Defendant's fentanyl caused the decedent's death.  Neither party advances either argument in its recent submissions to the undersigned and neither interpretation is the best reading of those comments.

At that hearing, Defendant objected to a statement in the pre-sentence investigation report that the fentanyl Defendant sold to the decedent on April 5, 2021, caused her death, noting that there was evidence of another drug sale to the decedent on April 5, 2021.  *See* ECF No. 66 at 5–6, 10–11.  The government rejoined that it was "arguing that under the preponderance of the evidence standard, the same drugs that were arranged by [Defendant] to be sold to the decedent [were] the same drugs that caused her to overdose and die."  *Id.* at 11.  Judge Kollar-Kotelly acknowledged that there was a dispute over the causation issue and noted that she had not seen evidence that "the fentanyl that [Defendant] specifically sold was the fentanyl that [the decedent] took and overdosed."  *Id.* at 12.  She ultimately decided that the pre-sentence report should be revised to reflect that there was a dispute over whether the fentanyl Defendant helped provide to the decedent on April 5, 2021, caused the decedent's death.  *Id.* at 13.  And that is what the revised final pre-sentence investigation report reflects:  "Defendant Larry Eastman sold drugs to the decedent.  At the plea hearing, he disputed that the drugs he sold had caused the decedent's death."  ECF No. 59, ¶ 32.

In Defendant's opposition to the government's motion for an order of restitution filed on August 7, 2023, he asserted that "[d]uring the government's allocution, the government specifically requested that the Court find that Mr. Eastman was responsible for the decedent's death by a preponderance of the evidence.  The Court denied the government's request given the statements in the plea agreement that there was a dispute regarding the cause of death."  ECF No. 69 at 3.  Later in that submission, Defendant stated that "the Court has already rejected the government's prior request to find [Defendant] liable for the decedent's death by a preponderance of the evidence," but recognized that the "Court [may] re-consider[] th[at] request" and asked to present evidence undermining the government's claim.  *Id.* at 5 n.3.  The undersigned does not consider Judge Kollar-Kotelly's statements at the sentencing hearing to reflect a definitive finding that a preponderance of the evidence fails to support the government's theory that the fentanyl Defendant arranged to sell to the decedent caused her death.  Rather, she merely acknowledged that there continued to be a dispute about that fact.  It is that dispute—raised again in the government's motion for order of restitution, ECF No. 64—that Judge Kollar-Kotelly-Kotelly referred to the undersigned for a Report and Recommendation.  Following that referral, Defendant has now been able to challenge the government's assertion with his own evidence and argument at an evidentiary hearing.  *See* ECF No. 76 (joint pre-hearing statement); ECF No. 76-3 (Defendant's exhibits); ECF No. 76-4 (Defendant's proposed findings of fact and conclusions of law); Rough Transcript of Sept. 5, 2023 Hearing ("Sept. 5, 2023 Rough Tr.") (on file with the chambers of the undersigned).

Later in the sentencing hearing, the government represented that the offense to which Defendant pleaded guilty was "a mandatory restitution offense" and that the government would seek "the payment of an amount equal to the cost of necessary funeral and related services" for the decedent under 18 U.S.C. § 3663A.  ECF No. 66 at 39.  Judge Kollar-Kotelly stated that support for those charges "can be provided at a later point" but observed that "[i]f it's mandatory, then the Court doesn't have any choice in the matter."  *Id.* at 40.  She continued, "Obviously, before I order anything in particular, I'll allow [Defendant] an opportunity to take a look at it."  *Id.*  In announcing Defendant's sentence, Judge Kollar-Kotelly stated:

> Evidently, there is mandatory restitution, and so you will be required to pay restitution. . . .  As to the amount of money of restitution, you will have an opportunity to see what the [g]overnment is requesting; and that you can certainly weigh in on in terms of what the amount is.  But you will have to pay it.

*Id.* at 54.  Although those statements are susceptible to an interpretation that Judge Kollar-Kotelly found that the

ECF Nos. 76-2, 76-4 (the parties' respective proposed findings of fact and conclusions of law). Those submissions also addressed whether, should the Court find that the fentanyl provided by the Defendant's drug conspiracy caused the decedent's death, responsibility for paying restitution should be apportioned between Defendant and his co-conspirator sister, Justice Eastman. *See id.* The undersigned also held an evidentiary hearing on September 5, 2023, at which the exhibits provided by the parties were admitted into evidence without objection and testimony was taken from former Special Agent David Crosby, who was the lead case agent from the Drug Enforcement Agency investigating the conspiracy to which Defendant pleaded guilty. *See generally* Sept. 5, 2023 Rough Tr.

### C.    Undisputed Facts Regarding Causation

As noted above, Defendant's admissions in connection with his guilty plea establish many of the necessary foundational facts at issue here. He has admitted that the decedent texted him around 11:00 p.m. on April 5, 2021, asking for "jammers" or "percs"—that is, pills containing fentanyl; that he instructed her to pay for the narcotics via a Cash App account belonging to his sister and directed the decedent to the Raynolds Place address, where she traveled via Lyft soon after 11:00 p.m. that night; that she procured the fentanyl at that address; and that she was found dead of fentanyl poisoning in her home the next morning. *See* ECF No. 41 at 26–28, 30. The sole open issue is whether the government can show by a preponderance of the evidence that the narcotics Defendant

---

government had shown that Defendant would be responsible for the decedent's funeral expenses at the sentencing hearing, that interpretation cannot be squared with her recognition earlier in the hearing that Defendant had not admitted (and, indeed, disputed) that the fentanyl he helped provide the decedent on April 5, 2021, caused the decedent's death. They are consistent, however, with a finding that Defendant would be responsible for restitution in the amount of the medical and other bills caused by the November 1, 2020 overdose on fentanyl provided by Defendant, which Defendant admitted caused the decedent significant bodily injury. As discussed above, however, the government has not sought restitution for those expenses. *See* ECF No. 76 at 4. In any case, the undersigned interprets the above-mentioned statements of Judge Kollar-Kotelly to leave open the question of whether the fentanyl Defendant helped to provide the decedent on April 5, 2021, caused her death, a conclusion buttressed again by her later referral of the restitution motion to the undersigned.

helped the decedent procure caused her death.

As to the causation question, the following facts are also undisputed.  CCTV footage from the vestibule of the decedent's apartment building shows that, a few minutes before 10:00 p.m. on April 5, 2021, the decedent came down the stairs from her apartment and met an individual—her boyfriend G.C.—at the front door to her apartment building.    *See* Gov't Exh. 8 at time stamp 22:18:07 to 22:18:21 (on file with the chambers of the undersigned).[5]  G.C. handed her an object. *See* Gov't Exh. 8 at time stamp 22:18:07 to 22:18:21; *see also* Def. Exh. 10 (CCTV footage time stamped 22:18:07 to 22:22:22) (on file with the chambers of the undersigned).  An enhanced image from the CCTV footage shows the object clutched in her hand to be, in the government's words, "rough in texture and approximately the size of a golf ball."  ECF No. 76-1 at 98; ECF No. 76-2 at 3.  Crosby testified that the object was not consistent in shape, size, or color, with fentanyl in powder or pill form.  Sept. 5, 2023 Rough Tr. at 15.  G.C. then entered into the vestibule and appeared to engage in some display of physical affection with the decedent for a few minutes, during which the decedent seemed to conduct some business on her phone.  *See* Gov't Exh. 8 at time stamp 22:18:22 to 22:22:15; *see also generally* Def. Exh. 10.  Thereafter, G.C. left the vestibule, exiting through the door of the apartment building, and the decedent walked back up the stairs towards her apartment. *See* Gov't Exh. 8 at time stamp 22:21:59 to 22:22:15; *see also* Def. Exh. 10 at time stamp 22:21:59 to 22:22:15.  Approximately an hour later, around 11:00 p.m. on April 5, 2021, the CCTV footage shows the decedent leaving through the front door of her apartment building.  *See* Gov't Exh. 9 at time stamp 23:26:00 to 23:26:12 (on file with the chambers of the undersigned).  No other visitor is captured in the CCTV footage between the time that the decedent walks back up the stairs to her apartment after meeting with G.C. and the time that she leaves the building about an hour later.  *See*

---

[5] The parties represent that the time stamp on the CCTV footage does not reflect the accurate time but rather is 26 minutes ahead.  ECF No. 76 at 4.

*generally* Gov't Exhs. 8, 9; *see also* Sept. 5, 2023 Rough Tr. at 17. A Lyft receipt shows that the decedent traveled from the vicinity of her apartment to the Raynolds Place, NE, address at approximately the time the CCTV footage shows her walking out the door of her apartment. *See* ECF No. 76-1 at 89; *see also* note 5, *supra*. The Lyft receipt then indicates the decedent traveled back to her apartment from Raynolds Place without making any other intermediate stops. *See* ECF No. 76-1 at 89. More specifically, she was picked up at 11:02 p.m. on April 5, 2021, from 2740 R Street, SE,—between 27th Street, SE, and 28 Street, SE, across the street from her apartment at 2701 R Street, SE; traveled to 2336 Raynolds Place, SE, at 11:09 p.m.; and was dropped off at 11:15 p.m. at 1704 27th Street, SE, on the side of her apartment building. *See id.*; *see also* ECF No. 79-2 at 1 (reporting the decedent's address as 2701 R Street, SE, Washington, D.C.); Sept. 5, 2023, Rough Tr. at 47–48. Crosby testified that the Lyft driver reported that, upon arrival at the Raynolds Place address, the decedent had a short interaction with a Black male and then returned in the car to the location at which she was dropped off. Sept. 5, 2023 Rough Tr. at 11.

During the hour between approximately 10:00 p.m. on April 5, 2021, when G.C. handed the decedent the object, and approximately 11:00 p.m. that night, when the decedent left her apartment building to travel to Raynolds Place, police reports from the Metropolitan Police Department ("MPD") as well as images from the decedent's cell phone show a series of text messages exchanged between the decedent and Defendant—these are the communications arranging for the narcotics delivery and payment to which Defendant admitted at his plea hearing. *See* ECF No. 76-1 at 85; ECF No. 76-3 at 35–37; ECF No. 79-8; *see also* ECF No. 41 at 27. Specifically, at 10:37 p.m., approximately 25 minutes before the CCTV footage shows decedent leaving her apartment building, the decedent asked Defendant for "jammers." *See* ECF No. 76-1 at 85; ECF No. 76-3 at 35; ECF No. 79-8 at 1. Defendant replied that he had "just left" but that "my mans has got some real glossy

11

ones." *See* ECF No. 76-1 at 85; ECF No. 76-3 at 36; ECF No. 79-8 at 1. Cell site data indicate that Defendant was not in the District of Columbia at the time, but Justice Eastman was near Raynolds Place. ECF No. 76 at 4. The decedent then asked the Defendant for "just . . . one" pill and indicated that she could pay by Cash App. *See* ECF No. 76-1 at 85; ECF No. 76-3 at 36; ECF No. 79-8 at 1. Defendant directed the decedent to the Raynolds Place address and sent her information for the Cash App account controlled by Justice Eastman. *See* ECF No. 76-1 at 86; ECF No. 76-3 at 36; ECF No. 79-8 at 2. Defendant then indicated that she had paid for the drugs through the Cash App account and that she was outside when her "ride" had arrived at the Raynolds Place address. *See* ECF No. 76-1 at 87; ECF No. 76-3 at 36; ECF No. 79-8 at 2. According to a police report, that conversation included the last outgoing messages on that phone. *See* ECF No. 76-3 at 36. During the period when the text messaging occurred, police records indicate that Defendant was making phone calls to Justice Eastman's phone. *See* ECF No. 79-8. The decedent's phone also reflects two payments of interest. One is the $30 payment made on April 5, 2021, to the Cash App account controlled by Justice Eastman. *See* ECF No. 76-3 at 6. Crosby testified that payment was the final payment reflected on her phone. Sept. 5, 2023 Rough Tr. at 27. There is also what appears to be a prior payment (the evidence before the undersigned does not include the date or time of the payment) of $120 to an account or entity known as "2 Many Blues." *See* ECF No. 76-3 at 6. Crosby was unable to trace the owner of that account. Sept. 5, 2023 Rough Tr. at 27–28.

Further evidence from the MPD shows that officers who began the investigation of the decedent's death received information that she "got her drugs from a guy named [G.C.] who lives across the street from her." ECF No. 76-4 at 1; ECF No. 76-3 at 21 (email from Officer Anthony Moye to Officer Lorenzo James); Sept. 5, 2023 Rough Tr. at 20. A later email between the same two law enforcement officers states that the decedent's mother "seems to think that [the decedent] got the

drugs from her boyfriend," presumably G.C.  ECF No. 76-4 at 2; ECF No. 76-3 at 20.  For his part, G.C. admitted to law enforcement that he met with the decedent in the vestibule of her apartment building on the night of April 5, 2021, but he was not asked (and he did not offer) whether he provided her drugs.  *See* ECF No. 76-3 at 29–31; ECF No. 79-6.  He also asserted that she called him at approximately 11:29 p.m. that night and they talked briefly before she said she was going to bed.  *See* ECF No. 76-3 at 30; ECF No. 79-6 at 2.

The decedent's mother also reported to law enforcement allegations related to another individual involved with the decedent—E.H.—with whom the decedent had a child and against whom she had sought a civil protection order for violent and physically abusive behavior.  *See generally* ECF No. 79-5.  The decedent's mother reported to the police investigating the death that E.H. had a history of such behavior against the decedent. *See* ECF No. 79-3 at 5–6.  He also allegedly had a history of providing the decedent drugs.  The decedent's mother asserted that in October 2020, Hagens had "trick[ed]" the decedent into buying three Percocet pills from him and then "snatched all her money" and that in January 2021 E.H. had "smush[ed] perk powder in her face."  *Id.* at 5.  The decedent's mother also asserted that E.H. was "trying to get [the decedent] loopy" on the Friday before her death—that is, April 2, 2021—and "trying to get [the decedent] high" on Saturday, April 3, 2021.  *Id.* at 4, 5.  The decedent appears to be the source of the mother's knowledge for each of those statements.  *Id.*

The decedent's mother also informed the police that E.H. discovered the decedent's body on the morning of April 6, 2021, after the decedent had failed to answer his phone calls or respond to his knocks on her window.  *Id.* at 3.  According to the decedent's MPD death report, E.H. told officers arriving at the scene that he had begun calling her at 4:00 a.m. to borrow money for a ride to work; when she did not answer, he went to her apartment and eventually  "climb[ed] up" to the decedent's

window and observed the decedent on the floor next to her bed, unmoving; he then "opened the unlocked window from the outside and climbed into the bedroom," where he found her unresponsive. ECF No. 79-2 at 1.  G.C. reported seeing E.H. leaning out of the decedent's bedroom window that morning appearing to be gesturing to the police or paramedics directing them as they arrived.  ECF No. 76-3 at 30.  At that time, the decedent's mother insisted to G.C. that E.H. had "robbed and killed [the decedent]."  ECF No. 79-3 at 4.  Photos taken of the decedent's apartment on April 6, 2021, show what appears to be marijuana in bud form, as well as a line of a white powdery substance on a glass-topped table with a credit card beside it.  ECF No. 76-3 at 23, 25–26.  Crosby testified that those who abuse illicit fentanyl generally take it as soon they procure it either by snorting pills crushed into a white powder or by intravenously injecting a solution containing fentanyl, methods that allow the drug to take effect faster than taking a pill orally.  Sept. 5, 2023 Rough Tr. at 6–7, 18–19.

Finally, photos from the decedent's phone show her holding between one and three small, round blue or white pills in her hands on different occasions.  *See* ECF No. 76-3 at 1–4.  When Defendant was arrested on January 26, 2022, law enforcement seized a cache of drugs from his residence in Maryland, including several small, round blue pills that tested positive for fentanyl.  *See* ECF No. 76-1 at 100; ECF No. 76-3 at 43–45; ECF No. 41 at 29; Sept. 5, 2023 Rough Tr. at 17–18, 30.

The parties disagree on the proper interpretation of this evidence.  The government argues that it shows that the fentanyl Defendant helped provide the decedent caused her death, noting that there is no evidence that anyone other than Defendant supplied the decedent with fentanyl "around the April 5 and 6, 2021, timeframe."  ECF No. 76-2 at 3.  Defendant argues that the evidence presented undermines the government's theory.  He contends that, given E.H.'s history of providing

or offering drugs to the decedent (including allegedly as recently as a few days before her death), her potential purchase of drugs from G.C. in the vestibule the evening before she died, and her tendency to purchase more than one pill at a time, it is more likely than not that she had additional sources for the fentanyl that she took that caused her death. *See* ECF No. 76-4 at 7.

As discussed below, based on the evidence before the Court, and the arguments of counsel in their submissions and at the September 5, 2023 hearing, the undersigned finds that the government has shown that it is more likely than not that the fentanyl the decedent procured from the drug conspiracy to which Defendant pleaded guilty caused the decedent's death and proposes the Court adopt that finding.

## II.    DISCUSSION

### A.    Timing and Deadlines under 18 U.S.C. § 3664(d)(5)

Although the parties have not raised it, the undersigned addresses at the outset a preliminary legal issue regarding timing and deadlines concerning the restitution motion before the Court. The statute guiding the procedures for issuing and enforcing restitution orders provides that

> [i]f the decedent's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the decedent's losses, not to exceed 90 days after sentencing.

18 U.S.C. § 3664(d)(5).[6] Here, the government waited until the sentencing hearing on June 15, 2023, to inform Judge Kollar-Kotelly that it would be seeking restitution for the decedent's funeral expenses but did not yet have the supporting documentation from the decedent's family. Minute Entry (June 15, 2023); ECF No. 66 at 1, 39–40. On July 27, 2023—42 days later—the government filed its motion for an order of restitution, attaching receipts for the funeral expenses. *See generally*

---

[6] That same provision provides a mechanism for amending a restitution order to account for later-discovered losses; that is not at issue here. *See* 18 U.S.C. § 3664(d)(5).

ECF No. 64.  On August 11, 2023—57 days after sentencing—Judge Kollar-Kotelly referred the motion to the undersigned.  *See* ECF No. 71.  That referral noted that the 90-day deadline of Section 3664(d)(5) was fast approaching on September 13, 2023.  *Id.*  After a status hearing on August 14, 2023, the undersigned scheduled a hearing on the motion for September 5, 2023, ECF No. 72, choosing that date largely because of logistical obstacles—including Defendant's attorney's difficulties communicating with Defendant at the correctional institution in New Jersey where he is serving his sentence, delays attributable to Defendant's potential transportation from there to this Court, questions as to that facility's capability to allow Defendant to appear remotely, and issues regarding a waiver of Defendant's presence at the hearing.  The hearing was ultimately held on September 5, 2023, eight days before the deadline for the "final determination of the decedent's losses."  18 U.S.C. § 3664(d)(5); *see also* Sept. 5, 2023 Rough Tr.  More, this Report and Recommendation, once issued, is subject to an objections period before the district judge may determine whether it should be adopted.  *See* Fed. R. Crim. P. 59(b); *see also* 18 U.S.C. § 3664(d)(6) (authorizing the referral of restitution issues to a magistrate judge for proposed findings of fact and recommendations, "subject to de novo determination of the issue by the court").  Thus, it appears that one deadline has been flubbed—the pre-sentencing deadline for the government or Probation Office to inform the Court that the decedent's losses were not yet ascertainable—and another—the 90-day deadline for the final determination of the restitution amount—is likely to be.[7]

The undersigned does not endorse missing statutory deadlines, no matter the circumstances.

---

[7] Judge Kollar-Kotelly issued an amended judgment on August 23, 2023, which identifies the "Date of Imposition of Judgment" as August 2, 2023.  ECF No. 75 at 1.  That amended judgment made two changes to the original judgment: it modified the date from which Defendant would be credited for time served (from January 27, 2023, to January 26, 2022) and noted that a restitution award was to be determined.  *Compare* ECF No. 75 at 2, 11, *with* ECF No. 60 at 2 *and* ECF No. 61 at 4.  The undersigned does not find that the entry of the amended judgment restarted the 90-day clock principally because Section 3664(d)(5) measures the 90-day period from "sentencing," not from the judgment, and here, Defendant was sentenced on June 15, 2023, not August 2, 2023.

However, the Supreme Court has held that the 90-day time limit in Section 3664(d)(5) is not jurisdictional, and its expiration does not deprive a court of the power to order restitution. *See Dolan v. United States*, 560 U.S. 605, 611 (2010) ("The fact that a sentencing court misses the statute's 90-day deadline, even through its own fault or that of the Government, does not deprive the court of the power to order restitution."); *see also United States v. Monzel*, 746 F. Supp. 2d 76, 82–83 (D.D.C. 2010); *United States v. Williams*, 353 F. Supp. 3d 14, 17 n.3 (D.D.C. 2019). That is especially true where, as here, the Court made clear at sentencing that restitution would be ordered. *See* ECF No. 66 at 54 ("[T]here is mandatory restitution, and so you will be required to pay restitution. . . . As to the amount of money of restitution, you will have an opportunity to see what the [g]overnment is requesting; and that you can certainly weigh in on in terms of what the amount is. But you will have to pay it."); *see also, e.g.*, *Dolan*, 560 U.S. at 608. Similarly, the court in *Monzel*, relying on the reasoning of *Dolan*, held that missing the ten-day pre-sentencing deadline is not a reason to deny a motion for an order of restitution, at least in the absence of prejudice to the defendant. *See Monzel*, 746 F. Supp. 2d at 83 ("In the absence of actual prejudice to Defendant, and for the reasons set forth by the Supreme Court in *Dolan,* the Government's failure to comply with the deadlines in § 3664 will not result in denial of its Motion for an Order of Restitution."). Defendant has identified no prejudice here; indeed, he has not objected to any missed deadline that has or is likely to occur. The undersigned does not find, therefore, that the government's motion should be denied on this ground.

**B.    Causation**

On to the merits of the government's motion. First, Defendant has admitted that the offense to which he pleaded guilty resulted in physical injury to the decedent as a result of her overdose in November 2020 and, as discussed below, the undersigned finds that the drugs he admittedly provided her on August 5, 2021, led to her death. ECF No. 38 at 4; ECF No. 39 at 2–3; ECF No. 41 at 29–30.

Therefore, the MVRA applies because it is an offense "in which an identifiable victim . . . suffered a physical injury."  18 U.S.C. § 3663A(c)(1)(B).  Neither party suggests otherwise.  The government has also shown by a preponderance of the evidence that the decedent's funeral and related expenses totaled $20,652.25, *see* ECF No. 64-1 (receipts), an amount Defendant does not dispute.  As signaled above, the only issue is causation.

The evidence, including Defendant's admissions, establishes that Defendant arranged for the decedent to purchase one pill containing fentanyl from the Raynolds Place address on the night of April 5, 2021, and that the decedent was found dead in her apartment of fentanyl poisoning on April 6, 2021.  *See* ECF No. 38 at 3; ECF No. 39 at 2–3; ECF No. 41 at 29–30; ECF No. 76-1 at 89; ECF No. 76-3 at 35–37; ECF No. 79-2 at 1. At approximately 10:00 p.m. on April 5, 2021, she is captured in CCTV footage from the vestibule of her apartment building receiving an object from G.C.—an object that, although potentially drugs, such as marijuana, is not consistent with the size, shape, or color of fentanyl in pill or powder form.  *See* Gov't Exh. 8 at time stamp 22:18:07 to 22:18:21; Def. Exh. 10; ECF No. 76-2 at 3; Sept. 5, 2023 Rough Tr. at 15.  Text messages from her phone show that approximately 30 minutes later, she began a conversation with Defendant centered on procuring fentanyl.  *See* ECF No. 76-1 at 85–87; ECF No. 76-3 at 35–36; ECF No. 79-8.  She is next seen leaving her apartment building at approximately 11:00 p.m. on April 5, 2023.  *See* Gov't Exh. 9 at time stamp 23:26:00 to 23:26:12.  A Lyft receipt shows that the decedent traveled from the vicinity of her apartment to the Raynolds Place, NE, address at approximately the time the CCTV footage shows her walking out the door of her apartment and then returned to the vicinity of the apartment without making other stops.  *See* ECF No. 76-1 at 89.  The conversation with Defendant arranging for the payment and pickup of the fentanyl is the last one reflected on the decedent's phone.  *See* ECF No. 76-3 at 36.  The final transaction reflected on her phone is the transfer of $30 to the Cash App

account controlled by Justice Eastman in payment for the fentanyl. *See* ECF No. 76-3 at 6; Sept. 5, 2023 Rough Tr. at 27. According to the case agent, the government's investigation uncovered no concrete evidence that the decedent procured fentanyl from any other source during the time period from the evening of April 5, 2021, to the morning of April 6, 2021. Sept. 5, 2023 Rough Tr. at 11–12, 33. The government's theory is thus a straightforward one: Defendant admitted to helping to provide the decedent with fentanyl on April 5, 2021; the decedent is seen alive and not apparently under the influence of fentanyl at approximately 11:00 p.m. on April 5, 2021, on her way to pick up that fentanyl; she returns to her neighborhood at approximately 11:15 p.m. having paid for that fentanyl; there is no indication that she made arrangements to procure or pay for any additional fentanyl on the evening of April 5 or morning of April 6, 2021; and she was found dead in her apartment of fentanyl poisoning the morning of April 6, 2021. Together, the undersigned believes that evidence demonstrates that it is more likely than not that the fentanyl Defendant helped to provide her caused her death.

Defendant's version of events is somewhat more complex. Although he admits, as he must, that he helped provide the decedent fentanyl the night before she was found dead, he argues it is unlikely that the decedent took only that single pill. He points to photographs from the decedent's phone showing her hand holding three blue pills to argue that she "had a history of buying more than one pill." ECF No. 76-4 at 7. From that, he extrapolates that the decedent likely procured additional fentanyl on or around April 5 from a source other than the conspiracy to which Defendant pleaded guilty. *See id.* He further suggests two potential sources: G.C., with whom the decedent "met . . . the evening of her death during which he handed her what appear to be narcotics"; and E.H., who had provided or offered her pills in the past and could have accessed her apartment through the window the night of April 5, 2021, or early morning of April 6, 2021. *See id.*

19

The undersigned finds that defendant's theory, which is largely based on surmise and conjecture, does not sufficiently undermine the evidence that Defendant's fentanyl caused the decedent's death. Take the foundational premise that the decedent "had a history of buying more than one pill." ECF No. 76-4 at 7. The evidence supporting that hypothesis is (1) four undated photographs from the decedent's phone showing a hand holding three blue pills that are consistent with the appearance of illicit fentanyl pills, *see* ECF No. 76-3 at 2–5; (2) an entry on the decedent's phone showing a payment of $120 to "2 Many Blues," ECF No. 76-3 at 6; and (3) a statement from the decedent's mother to the police that E.H. "trick[ed]" the decedent into purchasing three Percocet pills from him on October 13, 2020, ECF No. 79-3 at 5. The photographs appear to show that the decedent did, on occasion, purchase more than one pill. But there is also a photograph of the decedent with only one pill in her hand, ECF No. 76-3 at 1—although Crosby testified that the appearance of that pill was not consistent with a pill containing fentanyl, Sept. 5, 2023 Rough Tr. at 28–29. In any event, it is hard to derive a "purchase history" from a few photographs showing three pills in the palm of a hand. More, Defendant cannot identify when those photographs were taken—only that they "appear to be taken on different days." ECF No. 76-4 at 7. That is, there is nothing to indicate that they were taken in temporal proximity to the events of April 5 and 6, 2021—they could have been taken months or years prior to that. They are not particularly probative, therefore, of the decedent's practice around the time of her death. Similarly, a $120 payment to "2 Many Blues" *could* reflect a purchase of four fentanyl pills at $30 each—the going rate according to Crosby—but there is no evidence suggesting what, precisely, "2 Many Blues" refers to, who owned the handle, or when that payment was made. *See* Sept. 5, 2023 Rough Tr. at 27–28. Decedent's mother's statement does mention a putative purchase of three pills from E.H., but that reportedly occurred on October 13, 2020, months prior to the time period at issue in April 2021. ECF No. 76-4 at 7; Sept. 5, 2023 Rough

20

Tr. at 32.  She also states that some unexplained "trick" was involved.  ECF No. 79-3- at 5 (stating that E.H. "wound up tricking [the decedent] into purchasing 3 whereupon he snatched all her money and beat Cairo, her female companion up").  It is difficult to glean what, precisely, the decedent's mother is reporting by that statement.  More generally, it also appears that she harbors some animus against E.H. who she believed had violently abused and mistreated her daughter in the past.  *See generally* ECF No. 79-3 at 5–6; ECF No. 79-5.  Finally, the statement reflects hearsay within hearsay—a statement made by the decedent to her mother and by her mother to law enforcement, *see* Fed. R. Evid. 801(c), 805—which, although admissible in these proceedings to help guide the Court "toward a more enlightened and just sentence," *Bras,* 483 F.3d at 108, suggests its probative value is limited.  For all of the foregoing reasons, the undersigned does not find the decedent's mother's statement significantly probative on the question whether the decedent generally procured more than one fentanyl pill at a time or, more directly, whether the decedent more likely than not procured additional fentanyl pills prior to her death, especially in light of the fact that there is no concrete evidence that the decedent procured more than the one fentanyl pill she undisputedly purchased from the Defendant on April 5, 2021—there are no text conversations in which she arranged for the additional purchase of fentanyl, no indication that she picked up or received delivery of additional fentanyl, and no records establishing that she made additional payments for fentanyl.

Similar deficiencies plague Defendant's hypotheses that the decedent likely received additional fentanyl from G.C. or E.H.  As to G.C., Defendant did not dispute Crosby's hearing testimony that the object G.C. provided the decedent in the vestibule was not consistent in shape, size, or color with fentanyl pills or powder—a conclusion with which the undersigned agrees having viewed the enhanced screenshot of the object that was passed.  *See* ECF No. 76-1 at 98. Defendant suggests, however, that fentanyl could have been hidden within the material that G.C. handed to her.

*See* ECF No 76-4 at 7; Sept. 5, 2023 Rough Tr. at 21, 38. But he does not explain why G.C. would transport fentanyl in the form of pills or powder in such a manner. Additionally, Crosby testified that those who abuse fentanyl generally ingest the drug soon after procuring it and that it takes effect almost immediately. Sept. 5, 2023 Rough Tr. at 7. That is, if G.C. had supplied the decedent with fentanyl at approximately 10:00 p.m. on April 5, 2021, she would likely have taken it soon thereafter. Instead, according to Defendant's theory, she commenced to procure an additional fentanyl pill from Defendant and appeared—apparently unimpaired—in CCTV footage one hour later at approximately 11:00 p.m. to pick up that extra dose. Alternatively, Defendant supposes that, when the decedent was dropped off by her Lyft diver after her trip to Raynolds Place, she might have visited G.C., who lived across the street from her, and gotten additional fentanyl from him. Sept. 5, 2023 Rough Tr. at 36. Again, there is no probative evidence that occurred.[8] Indeed, there is evidence that suggests otherwise. It is uncontroverted that when Defendant asked the decedent how much fentanyl she wanted around 10:37 p.m., she asked to "just get one" and paid for one. ECF No. 76-1 at 85; *see* Sept. 5, 2023 Rough Tr. at 28 (Crosby testifying that $30 was the "typical price" for one pill). Why, then, would she choose to procure additional pills less than one hour later from G.C. rather than from Defendant when she spoke to him less than one hour earlier? More, the decedent arrived back at her apartment building at 11:15 p.m. on April 5, 2021, after traveling to Raynolds Place. *See* ECF No. 76-1 at 89. G.C. reported to law enforcement when they interviewed him about the decedent's death that she telephoned him at 11:29 p.m. on April 5, 2021, to ask if he had heard an altercation on the street and that they spoke for a few minutes before she said she was going to bed. ECF No. 76-3 at

---

[8] Defendant argues that when the decedent returned from the Raynolds Place address, she was "dropped off across the street" from her building and that, since G.C. lived "across the street" from the decedent, she likely went to his apartment. Sept. 5, 2023 Rough Tr. at 20–21, 38. However, as noted above and at the hearing, the decedent was not dropped off across the street from her apartment; rather, she was dropped off on the street in front of the side of her apartment building. *See id.* at 47–48. More, there is no evidence in the record as to where, precisely, G.C. lived—that is, across which street and how far away from the decedent's apartment building. *See id.*

30.  Although it is *possible* that the decedent could have exited her Lyft, visited G.C.'s apartment to procure some additional fentanyl, returned to her apartment, witnessed an altercation, and called to check in with G.C. (whom she had just seen) all within fourteen minutes, the undersigned does not find that probable.  Defendant alternatively suggests that E.H. might have climbed through the decedent's window and provided her with the bad fentanyl that killed in the late hours of April 5 after her return from Raynolds Place.  *See* ECF No. 76-4 at 7.  Defendant is forced to put forward that improbable theory of E.H.'s entry into the decedent's apartment because there is no CCTV footage of him coming in the front door of the building that night.  As above, there is no evidence that E.H. did so.

In short, Defendant's theory that the decedent likely purchased and took additional fentanyl on the night before or morning of her death is based on pure speculation.  In the face of the evidence that Defendant's drug conspiracy undisputedly provided the decedent fentanyl on April 5, 2021, the night before she was found dead of fentanyl poisoning, Defendant provides no proof that the decedent possessed any fentanyl other than that provided by Defendant; rather, he proposes the mere possibility that she could have done so.  The undersigned finds that showing insufficient to undermine the government's evidence, especially when its burden of proof at sentencing is not beyond a reasonable doubt but merely a preponderance of the evidence.  Accordingly, the undersigned proposes that the Court find that the fentanyl that Defendant helped to provide the decedent on April 5, 2023, caused her death and that he is therefore liable for payment of restitution related to the decedent's funeral and burial expenses.

### C.    Apportionment

Defendant contends that the Court should apportion any liability for payment of the $20,652.25 restitution amount between his co-conspirator Justice Eastman and himself.  As a legal

matter, he argues that the MVRA makes payment of restitution mandatory for a defendant who is convicted of an offense that causes physical injury to an identifiable victim: "The MVRA requires that the court '*shall* order . . . that the defendant make restitution to the victim of the offense, or, if the victim is deceased, to the victim's estate.'"  ECF No. 76-4 at 8 (alteration in original) (quoting 18 U.S.C. § 3663A(a)(1)).  Therefore, according to Defendant, if the Court finds that the conspiracy to which Justice Eastman pleaded guilty caused the decedent's death—as the undersigned has recommended—it must order her to pay restitution.  More, 18 U.S.C. § 3664 clearly allows a court to apportion restitution among more than one defendant.  *See id.* § 3664(h).

As a factual matter, Defendant urges the Court to find that Justice Eastman was a major participant in the conspiracy and in the events that led to the decedent's death.  He points out that the parties have stipulated that Justice Eastman, unlike Defendant, was in the vicinity of the Raynolds Place address at the time the decedent traveled there to purchase the narcotics at issue on April 6, 2021.  *See* ECF No. 76 at 4.  He also offers evidence that Defendant placed several phone calls to Justice Eastman during the period when Defendant was making the arrangements for the drug sale with the decedent.  *See* ECF No. 79-8.  More, when it sought the pre-trial detention of both Defendant and Justice Eastman, the government provided evidence that indicated that Justice had a larger role in the conspiracy than merely taking payments—specifically, a picture from her iCloud account of Defendant with a large amount of cash and an Instagram post "joking about needing something she can sell and referencing pain killers."  ECF No. 8 at 7.  From this, he concludes that Justice Eastman had a significant role in providing the decedent with the fentanyl on April 5, 2021, that likely killed her and she should therefore be required to pay 50 percent of the restitution amount, or $10,326.12.  Alternatively, he requests that the undersigned recommend the Court order Defendant to pay only 50 percent of the restitution amount and leave the government to seek the rest elsewhere.  The

undersigned recommends finding Defendant liable for the full restitution amount of $20,652.25.

In pleading guilty, Defendant admitted to a much more significant role than did Justice Eastman in the events leading to the decedent's death. As noted, Defendant admitted to being the decedent's point of contact for procuring the fentanyl, arranging for it to be supplied to her, informing her how to pay for it, and directing her where to pick it up. *See* ECF No. 41 at 26–28. Justice Eastman, on the other hand, admitted that she "received and moved payments from customers purchasing pills containing fentanyl" from the Raynolds Place address, that she knew that those payments were for pills containing fentanyl, and that the total "amount of a mixture and substance containing a detectable amount of fentanyl" that she conspired to distribute was 36.273 grams. ECF No. 35 at 3; *see also* ECF No. 65 at 25–26. None of those admissions relate specifically to the fentanyl provided to the decedent on April 5, 2021, although it is undisputed that the decedent made the $30 payment to an account controlled by Justice Eastman. *See* ECF No. 76 at 5. To be sure, Judge Kollar-Kotelly noted at Justice Eastman's sentencing that "drugs sales would not be successful unless there was payment," but nevertheless acknowledged that Justice Eastman's role in the conspiracy was "limited" and related only to "accepting and moving payments that others received for drug sales." ECF No. 65 at 26–27. At Defendant's sentencing, Judge Kollar-Kotelly again recognized Justice Eastman's "lesser role"—limited to allowing others to "use her Cash App"—and placed her "in a different category" from Defendant. ECF No. 66 at 50. Consequently, Justice Eastman received a sentence of 37 months in prison compared to Defendant's sentence of 140 months. *Compare* ECF No. 65 at 65 *with* ECF No. 66 at 51. Defendant's attempt to establish that Justice Eastman had an enlarged role by noting that she was in the vicinity of Raynolds Place and in contact with Defendant when the decedent picked up the pill that likely killed her does not significantly move the needle. The evidence shows that Justice Eastman did not provide the drugs

to the decedent—Crosby testified that decedent met with a Black male when she went to that address on the evening of April 5, 2021, a fact which Judge Kollar-Kotelly noted at Justice Eastman's sentencing, *see* Sept. 5, 2023 Rough Tr. at 11; ECF No. 65 at 27.  Guided by the evidence as well as the statements and judgments made by Judge Kollar-Kotelly, the undersigned finds that Defendant had a considerably more prominent role in the conspiracy and in the transaction that likely caused the decedent's death than did Justice Eastman.

In *Dolan¸* the Supreme Court recognized that the MVRA's primary substantive purpose is "to ensure that victims of a crime receive full restitution."  *Dolan*, 560 U.S. at 612; *see also* 18 U.S.C. § 3664(f)(1)(A) ("In *each order of restitution*, the court *shall order restitution* to each victim on the *full amount* of each victim's losses as determined by the court[.]" (emphases added)).  In part to realize that goal, "Congress has vested the district court with considerable discretion in fashioning restitution orders." *United States v. Yalincak*, 30 F.4th 115, 122 (2d Cir. 2022).  And so, even where a court finds that "more than 1 defendant has contributed to the loss of a victim," it "may make each defendant liable for payment of the full amount of restitution." 18 U.S.C. § 3664(h).  Alternatively, a court may apportion the liability between or among defendant to reflect each one's culpability and economic circumstances, *see id.*; or, as some courts have found, may apply a "hybrid approach" by holding the "most significant offender . . . liable for the full amount of the loss," while requiring "lesser participants . . . to contribute lesser amounts," *Yalincak*, 30 F.4th at 124.  Here, in light of the finding above that Defendant is the "principal organizer of the scheme," *id.*, that caused the decedent's death, the undersigned recommends that the Court reject Defendant's apportionment proposals and enter an order making him liable for the full amount of restitution.

The undersigned does not further address the liability of Justice Eastman for three reasons. First, it is not clear that Justice Eastman's liability for restitution is properly before the undersigned.

Judge Kollar-Kotelly referred only the government's motion for an order of restitution against Defendant to a magistrate judge, and that motion makes no mention of ordering Justice Eastman to pay restitution. *See* ECF No. 64 (motion); ECF No. 71 (referral). To be sure, Defendant's opposition to that motion argues in favor of requiring Justice Eastman to be responsible for restitution and, in light of that argument, the undersigned ordered the parties to address the question of apportionment in their recent submissions. *See* ECF No. 69 at 5–6 (opposition); ECF No. 72 at 1–2. But finding Justice Eastman liable for payment of restitution would affect her sentence (and require amendment of the judgment against her) and Judge Kollar-Kotelly's referral does not appear to require or even invite the undersigned to make any recommendations regarding that judgment or sentence.

Second, and critically, neither party has addressed a fundamental issue in their briefing on this issue: whether the Court may, consistent with the Constitution and the Federal Rules of Criminal Procedure, order Justice Eastman to pay restitution pursuant to these proceedings. "[A] defendant is guaranteed the right to be present at any stage of the criminal proceedings that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). The right to be present at sentencing is reflected in Rule 43 of the Federal Rules of Criminal Procedure, which requires defendants to be present at sentencings unless they waive their presence (and the sentencing is for a non-capital crime).[9] *See* Fed. R. Crim. P. 43(a)(3), (c)(1)(B); *see also, e.g. United States v. Diggles*, 957 F.3d 551, 558 (5th Cir. 2020) (noting that the constitutional right to be present at sentencing is "reflected in Federal Rule of Criminal Procedure 43(a)(3)"). Courts have held that "restitution is a component of a criminal sentence," *United States*

---

[9] Presence is not required if "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." Fed. R. Crim. P. 43(b)(4). Neither of those provisions is involved here. Rule 35 allows a court to correct a sentence for "arithmetical, technical, or other clear error" within fourteen days of its oral pronouncement or to reduce a sentence for substantial assistance. Fed. R. Crim. P. 35. Section 3582(c) allows modification of an imposed term of imprisonment under certain circumstances. *See* 18 U.S.C. § 3582(c).

*v. Anthony*, 25 F.4th 792, 796 (11th Cir. 2022); *see also, e.g.*, *United States v. O'Brien*, No. 11 Cr. 652, 2020 WL 5536593, at \*2 (S.D.N.Y. Aug. 19, 2020) ("[T]he imposition of restitution was part of [the defendant's] criminal sentencing[.]"), and that, therefore, a defendant has a right to be present at proceedings to determine whether restitution will be ordered and, if so, in what amount, *see United States v. Lockwood*, 165 F.3d 919 (9th Cir. 1998) (holding that a defendant has a right to be present at a restitution hearing unless he has voluntarily, knowingly, and intelligently waived that right); *United States v. Johnson*, 06-cr-176, 2009 WL 4043551, at \*6 (D. Neb. Nov. 20, 2009) ("The defendant has shown that he was denied his constitutional right to be present at the restitution hearing, a critical stage of the proceedings."). Justice Eastman was neither present at these proceedings nor waived her right to attend.

Third, the Sixth Amendment guarantees a defendant's right to the assistance of counsel "at every critical stage of a criminal prosecution." *United States v. Klat*, 156 F.3d 1258, 1262 (D.C. Cir. 1998). At least one court has held that "the final determination of a mandatory restitution award under §3664(d)(5) constitutes a critical stage during which a defendant is entitled to the assistance of counsel." *United States v. Pleitez*, 876 F.3d 150, 159 (5th Cir. 2017). Justice Eastman did not enjoy the assistance of counsel in these proceedings. An order requiring her to pay restitution would therefore appear to violate both the Constitution and the Federal Rules of Criminal Procedure.

For these reasons, and because, to paraphrase the Second Circuit in *Yalincak*, "neither the principle of just punishment nor that of maximizing the chances for victims to achieve full recompense warrants reducing the size of the restitution obligation imposed on the principal organizer of the scheme by the amounts [that might be] allocated to that person's minor accomplices," 30 F.4th at 124, the undersigned recommends holding Defendant liable for the full amount of $20,652.25 in restitution and makes no recommendation as to Justice Eastman's liability for

restitution.[10]

## RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court find by a preponderance of the evidence that the fentanyl that Defendant helped to provide the decedent caused her death and recommends that Defendant be ordered to pay the decedent's estate, or a family member assuming the decedent's rights, the amount of $20,625.52 in restitution for the decedent's funeral and burial expenses, subject to the statutory requirement that compensation received from "insurance or any other source" be paid to that source (after all restitution to which the victim has been entitled is paid), 18 U.S.C. § 3664(j)(1), and an offset for "any amount later recovered as compensatory damages for the same loss" in a civil proceeding, *id.* § 3664(j)(2).

\*      \*      \*      \*      \*

The parties are advised that under the provisions of Local Criminal Rule 59.2(b) of the United States District Court for the District of Columbia, any party who objects to this Report and Recommendation must file a written objection thereto within 14 days of the party's receipt of this Report and Recommendation.  The written objections must be denominated "Objections to the Magistrate Judge's Proposed Findings and Recommendations," and specifically identify the portion of the report and/or recommendation to which objection is made and the basis for such objections. The parties are further advised that failure to file timely objections to the findings and recommendations as set forth in this report may waive the right of appeal from an order of the District

---

[10] A court may take into account ability to pay in its decision about apportioning or distributing liability among or between responsible defendants.  *See* 18 U.S.C. § 3664(h).  Here, the only information in the record that reflects an ability to pay is that the Court found both Defendant and Justice Eastman unable to pay a fine.  The undersigned thus finds that ability to pay would make no difference to the recommendation here.  In addition, neither the motion referred to the undersigned nor the subsequent submissions by the parties addressed "the manner in which, and the schedule according to which, the restitution is to be paid"—a determination that requires a court to consider a defendant's ability to pay, 18 U.S.C. § 3664(f)(1)(2), a factual issue on which the record is, as noted, sparse.  Therefore, the undersigned does not address it.

Court adopting such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).


Date:    September 8, 2023

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE